IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

MICHAEL LYNN WILLIAMS                                                      PLAINTIFF


V.                                    CIVIL NO. 4:09-cv-04088


FORMER SHERIFF LINDA RAMBO;
WARDEN JANICE NICKLESON;
JAILER DOLLY SIMMONS;
SGT. RACHEL JONES; WAYNE
WALKER; DEPUTY DON THORNELL;
DEPUTY CECIL WHITE; SHERIFF RON
STOVALL; SGT. WOODY GILES; MAJOR
GARY TURNER; SHEILA ABRAHAM-DRAKE;
and JIMMY BALLARD                                                        DEFENDANTS

## REPORT AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE

Plaintiff, Michael Williams, filed this civil rights action pursuant to the provisions of 42 U.S.C. § 1983. He proceeds *pro se* and *in forma pauperis.* Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3)(2011), the Honorable Susan O. Hickey, United States District Judge, referred this case to the undersigned for the purpose of making a report and recommendation.

The events at issue in this case occurred while Williams was incarcerated at the Miller County Detention Center ("MCDC"). Specifically, Williams maintains that the Defendants failed to protect him from an attack by fellow inmates on September 20, 2008 and again on March 5, 2009.

An evidentiary hearing was held on July 10, 2012. At the hearing, the testimony of the following witnesses was taken: (1) Plaintiff Michael Williams; (2) Willie Mixon; (3) Darlene Cheatham; (4) Sergeant Johnny Bailey; (5) Kevin Hampton; (6) Victor Raggs; (7) Jimmy Ballard;

1

(8) Cecil White; (9) Rachel Jones; (10) Dolly Simmons; (11) Linda Rambo; (12) Janice Nickleson; (13) Sheriff Ron Stovall; (14) Woody Giles; (15) Major Gary Turner; and (16) Don Thornell.  At the conclusion of the hearing, the record was left open for: (1) Defendant Don Thornell to submit any records relating to the September 20, 2008 incident located in his files; and (2) Defendant Wayne Walker[1] to testify.  Defendant Thornell located his records relating to the September 20, 2008 incident and those records have been received by the Court.[2]  Additionally, a supplemental hearing was held on October 4, 2012, and the testimony of Wayne Walker was taken at that time.

## I.   <u>BACKGROUND AND EVIDENCE</u>

For purposes of this Report and Recommendation, the testimony of the witnesses will be summarized.

***Plaintiff Michael Williams***

Williams was incarcerated in the MCDC from September 2008 to January 2010.  Williams was sentenced on October 9, 2009, as such, he was a pretrial detainee during the times at issue here.  Williams was booked into the MCDC on September 10, 2008 and housed in the E-Pod.  E-

---

[1] The Court ordered service on Walker on August 30, 2010.  ECF No. 9.  The summons was returned unexecuted on September 20, 2010.  ECF No. 11.  On September 23, 2010, the Court ordered Williams to provide Walker's current address for service.  ECF No. 17.  Williams was unable to do so.  The Court then directed Williams to provide identifying information regarding Walker.  ECF No. 46.  Williams complied.  ECF No. 50.  The Court obtain an address for Walker, and ordered service on him on May 10, 2011.  ECF No. 57.  There is no indication on the docket as to whether the May 10, 2011 service was ever executed.  On July 13, 2012, the Court again ordered service for Walker.  ECF No. 109.  Service was executed and Walker answered the Complaint on July 25, 2012.  ECF Nos. 110, 114.  The summons issued in May 2011 was then returned and docketed indicating Walker was never served in May 2011.  ECF No. 113.  Therefore, Walker was not available at the initial hearing prompting the scheduling of a supplemental hearing.

[2] The records from Defendant Thornell have been labeled Court's Exhibits 1 - 5 and were admitted in the supplemental hearing on October 4, 2012.

Pod is a protective custody pod for inmates that need protection from other inmates in the facility, such Williams with a sex offender charge.

Williams testified that on September 17 or 18, 2008,[3] Officer Jimmy Ballard ("Ballard") let an inmate named Cortez into E-pod. Cortez walked around the pod with a big stick then Ballard let Cortez out of the pod. Williams cell mate also informed Williams the cell mate had friends in A-Pod that wanted the cell mate to "jump" Williams. Williams reported Cortez's actions and his cell mate's comments to Ballard, however, Ballard did nothing. Williams' testimony comports with a statement he gave investigator Don Thornell in September 2008. *See* Court's Ex. 5.

Williams also testified that on September 19, 2008,[4] at 4:00 or 5:00 p.m., Terrell Duke came to E-Pod while Williams was sitting at a table in the day room watching television. Duke called Williams by name, and asked Williams if he knew C.D.[5] Duke then told Williams "I will be back" and "[y]ou don't know me but you will." Duke then left E-Pod. Again, Williams' testimony comports with a statement he gave investigator Don Thornell in September 2008. *See* Court's Ex. 5. After Duke's threat, Williams called his sister, Darlene Cheatham, and told her he was scared for his safety. Ms. Cheatham told Williams she would call Sheriff Rambo. Williams

---

[3] Williams testified the Cortez incident occurred on September 18, 2008 but in Williams statement to investigator Don Thornell he stated it occurred on September 17, 2008. *See* Court's Ex. 5.

[4] Williams testified the Duke threat occurred on September 19, 2008 but in Williams statement to investigator Don Thornell he stated it occurred on September 18, 2008. *See* Court's Ex. 5.

[5] The Court notes that C.D. is the alleged victim involved in Williams's criminal charges. C.D. is a minor and therefore, for the purposes of this Report and Recommendation shall be referred to by initials only.

3

also testified that he informed Ballard that Duke threatened him, and asked to speak to Ballard's supervisor. Ballard informed Williams his supervisor was at lunch. Williams testified he was never able to speak with Ballard's supervisor.

Williams testified that on September 20, 2008, Ballard came into E-Pod around 5:00 p.m. to pass out medication. While inside E-Pod, Ballard radioed to open the E-pod door. The door was opened, but Ballard let it close without leaving the pod. According to Williams, Ballard then radioed again to open the door and stood inside the pod with the door open. Williams testified it was like he was waiting for someone to come inside E-Pod.

Williams testified he saw Duke coming down the hall so he ran up the pod stairs. Williams testified Duke and three other inmates ran past Ballard in the E-Pod doorway, grabbed Williams, and dragged him down the stairs. Duke and the other inmates also hit Williams (hereinafter "Duke Attack"). Williams testified he begged the other inmates in E-Pod or Ballard to help him but no one did. After the Duke Attack was finished, Williams got up and everyone was gone including Ballard. Williams then saw Ballard in the hallway passing out dinner trays. Williams testified he was unsure if Ballard was still inside the pod when Duke and the three inmates were hitting him. Additionally, Ballard never returned to E-Pod to check on Williams. According to Williams, guards at the MCDC let inmates out of their pods and some inmates could just get out of their pods on their own.

Williams testified he called Ms. Cheatham and told her about the Duke Attack, and Ms. Cheatham called Rambo to report the incident. According to Williams, Officer Dolly Simmons came to E-Pod to get Williams so he could speak with Rambo on the phone. Williams testified Rambo told him Duke and the other inmates should not have been out of their pods and asked  if

4

he needed to go to the hospital.  Williams was placed in the "R&D"[6] area until he was transported to the hospital.  Williams testified that once he returned to the MCDC, he was kept in isolation for four days and then placed in C-Pod.

The hospital doctor sent Williams back to the MCDC with prescriptions that were never filled. Williams testified he saw Dr. Stringfellow in the MCDC infirmary approximately one week after the Duke Attack and received a prescription and a physical.  According to Williams, his head and eye injury hurt him the most and he still suffers from blurry vision and headaches. Additionally, Williams now has to wear glasses and his back hurt for approximately one week after the incident.  Further, Williams' tooth was knocked loose, and it was pulled by the jail dentist. Lastly, Williams suffered a cut to his hand and shin that did not bother him much but did bleed.

Williams testified Sergeant Baily took pictures of Williams' injuries after the Duke Attack. Additionally, Williams testified there are cameras in E-Pod—one above the door and one above the stairs.[7]  Williams also testified the Criminal Investigation Department ("CID") investigator, Don Thornell, asked Simmons why she did not do a report on the Duke attack and Simmons responded that she was unaware she was required to make a report.  Williams testified charges were filed regarding the Duke Attack but were later dropped.

After the Duke Attack, Williams was moved to C-Pod.  He remained there for one month. At that time, Administrator Janice Nickleson ordered Corporal Nash and Sergeant Jones to place Williams back in E-Pod.  Williams was in E-Pod for ten days.  Williams asked Rambo to move

---

[6] There is no explanation in the record of what area composes the "R&D" area, however, within this context the Court presumes it refers to the receiving and discharge area of the MCDC.

[7] Defense counsel informed the Court that no pictures or camera footage exist from the Duke Attack.

5

him because the intercom system did not work properly in E-Pod so there was no way to get a guard's attention if you needed help.

Williams testified that on March 5, 2009 at approximately 5:00 p.m., Williams was playing dominos with Rodrick Mitchell, James Moore, and Andrew Wimbly. Williams testified Mitchell told him "he talked too fucking much" and Williams responded. Mitchell then attacked Williams. According to Williams, Mitchell hit him, knocked him down, got him in a choke hold, beat his head under the chair, and ran him into tables ("Mitchell Attack"). Williams finally made it to the call button. Williams testified the incident lasted approximately ten minutes. Once Williams pushed the call button, Mitchell stopped attacking him. Williams testified no officer was at the door, even though, three officers should have been there during this time.

According to Williams, Officers Giles and Jones responded to the call button and called Mitchell and Wimbly out of the pod. Giles told Williams that Turner ordered the inmates to be put in separate pods. Williams was taken to R&D area and put in a holding cell with Mixon. Williams testified Giles took pictures of his injuries after the Mitchell Attack.

Williams testified Turner came in the next day, and asked Williams if Mitchell "had done that" to him. Turner told Williams the nurse would be around soon. Williams testified that Mitchell was still in the pod when he returned, but Mitchell was moved out of the pod later that same day. According to Williams, he asked Turner if he could press charges on Mitchell but nothing ever happened to Mitchell. Williams testified he also requested to speak with Sheriff Stovall but was not allowed to do so. Williams did, however, write Sheriff Stovall a letter regarding the situation.

According to Williams, he suffered a black eye, and busted lip, and shoulder and head

6

injuries from the Mitchell Attack.  Williams was not taken to the hospital but was examined by the nurse at the MCDC.  Williams testified he was in pain for one to three weeks after the Mitchell Attack.  Williams also testified that he was in a car accident in 2008 that injured his back and he has suffered back pain since that accident.

Williams believes Mitchell should not have been moved into the pod with him because Mitchell was moved from the Max pod for fighting and staying in trouble.  Williams testified Nickleson should have known Mitchell was a trouble inmate, however, Williams testified he never told anyone that he felt threatened by Mitchell, and he never filed a grievance against Mitchell. Further, Williams testified he and Mitchell were housed together for three weeks prior to the Mitchell Attack and never had a problem.  Williams also testified the Mitchell Attack was a surprise to him.

Williams also testified the MCDC policy of not locking inmates down and not having staff where they should be located caused Williams' constitutional rights to be violated.

***Willie Mixon***

Mixon was incarcerated in the MCDC from July 2007 to October 2009.  In September 2008, Mixon was housed in the Max C-Pod and in March 2009 he was housed in lockdown.

Mixon testified that on September 20, 2008 around 4:00 or 5:00 p.m., he saw four or five inmates run towards E-Pod, and he saw the same inmates re-enter Max A-Pod.  Mixon did not witness the Duke Attack, but he did see Williams ten to fifteen minutes after the attack.  Mixon testified Williams did not have blood on him but he was in pain.

Pill call at the MCDC is at 4:00 or 5:00 a.m., 12:00 p.m., and 6:00 p.m.  Mixon testified it was not pill call time when he saw the inmates running to E-Pod.  Mixon had not yet received

his evening pills, and he would have received them prior to E-Pod due to the order in which the officers distributed pills to the pods.  Mixon also testified an officer would have been standing outside of E-Pod door if it were pill call time and there was not an officer standing at the door.

Additionally, Mixon testified during this time at the MCDC inmates could open doors themselves and officers were letting inmates attack each other for retaliation.  Further, Mixon testified the call button in the pods only notified the back control booth, and an officer has to call the control booth to open a pod door.

Mr. Mixon did not witness any of the March 5, 2009 incident.  He only saw Williams after the fact and noted Williams had a black eye, swollen lip, bruises on his forehead, and generally "looked rough."  Mixon testified Williams slept on the floor in the holding cell after the March 5, 2009 incident and Warden Turner came to the holding cell the morning after.

### Darlene Cheatham

Ms. Cheatham is Williams' sister.  Ms. Cheatham testified she spoke with Williams on September 17, 2008 and he told her he was attacked.  Ms. Cheatham then called Rambo and told her the guards let Williams be attacked by other inmates.  Ms. Cheatham also testified she spoke with Nickleson after the Duke Attack.

Additionally, Ms. Cheatham testified she spoke with Williams after Duke threatened him.  Ms. Cheatham testified she called Rambo and told her Williams was being threatened.  According to Ms. Cheatham, this call was before the Duke Attack.

Ms. Cheatham wrote Rambo a letter on September 24, 2008, recounting the events surrounding the Duke attack.  *See* Plaintiff's Ex. 1B.  In this letter, Ms. Cheatham states she called Rambo on September 17, 2008, to inform her Williams was threatened by Terrell Duke.  Rambo

8

told Ms. Cheatham at that time that she would handle the situation. *See* Plaintiff's Ex. 1B. Ms. Cheatham also states in the letter that she observed Williams' injuries from the Duke attack at visitation on September 24, 2008. *See* Plaintiff's Ex. 1B. Ms. Cheatham then informed Rambo that she feared for Williams' safety and asked he be placed in protective custody. *See* Plaintiff's Ex. 1B.

### Johnny Bailey

Bailey worked at the MCDC from April 4, 2008 until February 2010. Bailey testified he did not recall any attacks on Williams, and he did not recall taking pictures of Williams after the Duke Attack. Bailey testified the practice at the MCDC at the times in issue required taking photographs of inmates involved in altercations, as well as, completing an incident report on the altercation. The first officer to arrive on the scene would generate the incident report. According to Bailey, any pictures taken were stored on the SD card in the MCDC camera and also on the MCDC computer. However, Bailey testified there are no incident reports or pictures regarding the Duke Attack.[8]

Additionally, Bailey testified that inmates did not get out of their pods on their own during the shifts he worked and inmates did not have keys to cell doors. Further, Bailey indicated inmates should not be allowed into a pod other than the one in which they are housed. Lastly, Bailey testified the violence in the MCDC was not any worse than any other detention center.

### Kevin Hampton

Hampton was employed at the MCDC from August 1999 to December 2009. In 2008

---

[8] Defense counsel informed the Court that no records exist from the MCDC for 2008 and 2009.

Hampton worked in the maintenance department and supervised the kitchen at the MCDC.  As a maintenance worker at the MCDC, Hampton worked on the cell doors in the Max.  In March 2009, Hampton was a sergeant at the MCDC.  Hampton was not Ballard's supervisor but testified Ballard worked the west end of the MCDC.  Hampton testified he did remember Terrell Duke as an inmate at the MCDC, but Hampton did not recall any altercation between Duke and Williams.

Hampton testified the policy at the MCDC was to prepare an incident report when there was an altercation between inmates.  Hampton was trained to write an incident report in response to any violence.  Hampton also testified that all of his records were at the MCDC when he left in December 2009.

Additionally, Hampton testified there was contraband brought in to the MCDC by the guards, and Hampton was aware that inmates could get out of their pods and go into other pods. Further, Hampton testified he heard of other guards letting inmates out of their cells at the MCDC and he knew inmates would leave the MCDC through the hole in the roof.  Hampton also testified some cameras in the MCDC worked and some did not, but the "cameras in E-Pod worked perfectly."  According to Hampton, someone in the front control room should have seen Williams being attacked by Duke.

***Victor Raggs***

Raggs worked at the MCDC from July 2008 to December 2008 as a correctional officer in the Max end.  Raggs was unaware of the Duke Attack or Mitchell Attack.

Raggs testified MCDC officers were required to document inmate altercations and take pictures.  According to Raggs, any pictures taken after an assault would be in the computer and hard copies would be in the inmates file in the administrative office.  Raggs testified inmate

records were kept in the R&D area, and to his knowledge there were inmate files when he was employed at the MCDC.

Raggs testified he was aware that inmates got out of their cells but the inmates were generally not allowed to move around.  According to Raggs, the cell doors were broken and could be opened but the pod doors could not be opened by the inmates.   Additionally Raggs testified that contraband was brought in by both guards and inmates

***Jimmy Ballard***

Ballard worked at the MCDC as a correctional officer for three or four months in 2008. Ballard could not remember if he was assigned to the Max end of the MCDC on September 18 - 20, 2008.

Ballard testified he did not let Cortez out of D-Pod and into E-Pod, and he does not remember Williams talking to him about the Cortez incident.  Ballard also testified that he does not remember talking to Williams about Duke's threats on September 19, 2008.

Ballard denied he stood with E-Pod door open while Duke and the other inmates came into E-Pod.  Instead, Ballard testified he was sitting at a table inside E-Pod passing out pills when Duke and other inmates "rushed in."  According to Ballard, the E-Pod door was closed and locked (with the key locked in a drawer), but the inmates were able to rush in to the pod.  Ballard believes either the inmates or someone in the control room opened the pod door.  Ballard testified that inmates could open pod doors on their own but he does not know how they did it.  Ballard also testified no one was in the Max end control room at this time, and he could not remember who was in the central control room.  Additionally, Ballard testified someone from the central control room must have opened E-Pod door since no one was in the Max control room.

11

According to Myranda Michelle Cummings' September 20, 2008 incident report, she was working central control at the time the Duke Attack occurred. *See* Court's Ex. 1. Cummings indicated in her report that Ballard and Wayne Walker were on "Max End" feeding chow. She received a call for all of the pods to be opened to feed. Cummings then received a radio message from Wayne Walker that there was a fight in Max E. Cummings radioed out to all officers that there was a fight in E-Pod. When Cummings returned to intake "they" brought Williams into intake and he was still there when Cummings shift ended at 7:00 p.m. *See* Court's Ex. 1.

Ballard also testified Wayne Walker was inside E-Pod with him, and E-Pod door stayed open while Duke and other inmates were inside the pod. Regarding the attack, Ballard testified Williams was hit two or three times by one inmate, but Williams did not fall down the stairs. According to Ballard, there were four or six inmates that came into E-Pod but only one of the inmates slipped past him. After the attack, the inmates ran out of E-Pod and into B-Pod. Ballard then radioed to close E-Pod door. Ballard also testified he attempted to take Williams to the nurse, but Williams was afraid of him and would not go.

Ballard testified that Hampton was his supervisor at this time. Ballard wrote an incident report a few minutes after the Duke attack and turned it into the front desk. *See* Court's Ex. 2. In his incident report, Ballard indicated that on September 18, 2008 at 5:30 p.m. he was in E-Pod passing out medication with the door locked behind him. Ballard called for Wayne Walker to let him out of E-Pod. When Walker opened E-Pod door, a group of offenders rushed past both Ballard and Walker. One of the inmates attacked Williams. Ballard attempted to restrain the attacking inmate but he broke free and hit Williams in the face a couple of times. Walker kept the other inmates out of the way during this time. The group of inmates then ran out of E-Pod and

back into A-Pod.  Ballard and Walker then shut the E-Pod door.  *See* Court's Ex. 2.    .

Ballard also testified the pod doors at the MCDC are pull/push and do not slide open.  Further, Ballard testified there are no cameras in the hallway at the MCDC.  Ballard resigned from the MCDC a few weeks after the Duke Attack.

### Cecil White

White worked in transportation and in the CID at the Miller County Sheriff's Department in 2008 and 2009 but left the department on June 14, 2009.  White testified that he had never seen Williams before, did not investigate the Mitchell Attack, and did not take pictures of Williams after the Mitchell Attack.

### Rachel Jones

Jones worked at the MCDC from January 2008 to May 2011.  Jones worked in the central control room on the night shift and also as a correctional officer during the days.  Jones also worked with Dolly Simmons in the R&D area of the MCDC.  Jones testified she did not recall the Duke Attack or the Mitchell Attack but she would not have made an incident report on either incident.

Jones, however, did make an incident report on the Duke Attack.  In her incident report, Jones indicated that on September 20, 2008 at approximately 6:00 p.m. she spoke with Sheriff Rambo.  Rambo asked Jones about a fight that occurred in E-Pod.  Jones was unaware of any fight but told Rambo she would go check on Williams.  When Jones arrived at E-Pod, Ballard was standing at the pod door.  Jones pulled Williams out of E-Pod and placed him in holding cell #6.  Jones then asked Sergeant Cummings to note Williams relocation in the computer and she also informed the incoming Sergeant of the situation with the Duke Attack.  *See* Court's Ex. 4.

***Dolly Simmons***

Simmons worked the intake desk on the night of September 20, 2008.  Simmons testified that she remembered Williams was assaulted but did not remember much about that night.  Simmons did, however, remember reporting the altercation to Nickleson.  Simmons testified  she contacted the nurse as well.  Simmons testified Williams' lip was bleeding, and he reported his head and back were hurting.  Simmons also testified she reported to the nurse that Williams needed to go to the emergency room.  Additionally, Simmons testified the policy at the MCDC, at that time, was for an inmate in an altercation to see the nurse to decide if he needed a visit to the emergency room.

Simmons denied she pulled Williams from E-Pod to speak with Rambo on the phone, and she does not remember who brought Williams into R&D.  According to Simmons, the procedure was for Simmons to notify Nickleson, and it was Nickleson that would authorize sending an inmate to the emergency room.  Simmons would then notify the sheriff, and lastly, she would notify CID.  It was also procedure to take pictures of the injured inmate but Simmons does not recall whether any pictures were taken of Williams.

Simmons testified that Officer Hacker was working in the central control room on the night of September 20, 2008.  The officer working central control could see the hallway in front of E-Pod.  Simmons also testified there were problems with the cameras in E-Pod.

***Linda Rambo***

Rambo was the sheriff of Miller County from January 2007 to November 1, 2008.   Rambo testified that she made a book of policies for the MCDC and it was kept at the MCDC, however, all of these policies were not carried out.  Rambo also testified there were training classes for the

14

MCDC employees, but training the MCDC employees was the jail administrator's responsibility.

Rambo testified she did not recall speaking with Williams or Ms. Cheatham, and she does not have any letters from Ms. Cheatham in her possession.  Rambo testified she was notified of the Duke Attack after it occurred but she did not recall the details.  Rambo did not receive an incident report on the Duke Attack, but she testified that one should have been placed in Williams' inmate file.  According to Rambo, incident reports were the jail administrator's responsibility.  Rambo did receive a report from CID investigator Don Thornell on the Duke Attack, and that report should be in Williams' inmate file at MCDC.  Rambo also testified she is puzzled as to why there are no records from the MCDC during this time period.  According to Rambo, all records were at the jail when she left in November 2008.

Rambo testified that in order for Duke and the other inmates to leave their pod something must have been wrong with their pod door.  Also, for Duke and the other inmates to enter E-Pod something must have been wrong with E-Pod door.  According to Rambo, the inmates would jam the pod doors with toothpicks and toothbrushes, and if an inmate wanted to get out of his pod he could do so.

Rambo also testified shake downs were conducted at the MCDC during this time and the hole in the ceiling of MCDC was there when she became sheriff.  Rambo was unable to fix the hole because the Miller County Quorum Court would not give her any money to fix it.

*Janice Nickleson*

Nickleson worked at the MCDC from 1993 to March 2009 and was the jail administrator in 2008 and 2009.  As administrator, Nickleson trained and supervised MCDC staff, however, the sheriff made the MCDC policies.

15

Nickleson testified that she did not recall receiving a call from Ms. Cheatham before Williams was attacked by Duke but she does remember speaking with Ms. Cheatham at some point regarding the Duke Attack. According to Nickleson, she would have documented a call from Ms. Cheatham and put it in Williams' file but she cannot recall if she did so. Additionally, Nickleson testified if she were notified of a threat she would have moved Williams into protective custody and notified CID to handle the situation. Nickleson does not recall speaking to Rambo about Williams or what was done for Williams after the Duke Attack. Nickleson also does not recall if Duke was placed in lockdown after the attack or whether Ballard was reprimanded in any way after the Duke attack.

According to Nickleson, the MCDC did have lockdown procedures and operational cameras during September 2008. Further, the MCDC policy was to complete an incident report on any altercation and place a copy of that report in the inmate's file. The inmates would then be separated until the CID completed their investigation. At that point, the CID would advise the jail who was at fault and who should be locked down. Nickleson testified the normal procedure would be to lockdown the attackers in their cells with no commissary or visitation. Nickleson could not recall if she viewed any camera footage of the Duke attack.

Further, according to Nickleson, the cameras in the MCDC worked and if they failed, maintenance fixed them right away. Nickleson testified she was not aware of inmates getting out of their cells on their own but she did know the inmates were stuffing things into the door locks. Nickleson also testified she was aware inmates in the west end C-Pod could escape out of the roof of the MCDC. The hole in the roof was there for a long time but Rambo could not get money to fix it. Nickleson testified she had officers sit at the hole twenty-four hours a day, but the officers would

16

allow the inmates to escape through the hole.  Nickleson also testified the officers brought contraband into the MCDC.  To combat this problem, she had officers searched before their shifts.

In December 2008, Nickleson was demoted to correctional officer.  Nickleson testified that all of the records were still at the MCDC in the intake area filing cabinet when she left there in March 2009.

Nickleson denied that the inmates had destroyed the jail by January 2009.  She also denied all of the cameras were broken and that there was no security on the MCDC windows.  Finally, Nickleson denied that the inmates could unlock the cell doors.  Further, Nickleson testified there was a written policy to complete an incident report on all inmate violence and also training for employees in place at the MCDC in January 2009.  Nickleson also testified her officers were certified and the "jail standards" were followed.  Finally, according to Nickleson, there was never a time the control booth at the MCDC was unmanned.

### Sheriff Ron Stovall

Ron Stovall took over duties as Sheriff of Miller County at midnight on January 1, 2009. Sheriff Stovall did not have an open door policy with the inmates.  Inmates took up their concerns with the MCDC administrator.  Sheriff Stovall testified he had no knowledge of the Mitchell Attack and if he received a letter from Williams about it, he would have returned the letter to the MCDC.

Sheriff Stovall testified there were no records on the Duke Attack or Mitchell Attack, but clarified that there are sparse and incomplete records at the MCDC from the times in issue here. Sheriff Stovall explained the MCDC keeps two types of records—an electronic system called Crime Star and a paper file.  Sheriff Stovall testified no paper records were found regarding the Duke Attack or Mitchell Attack and only Williams' booking detail was located in the Crime Star database.

17

Sheriff Stovall testified  that, in January 2009 when he took control of the MCDC, the inmates had destroyed the MCDC—the cameras were not functioning, there was no security on the windows, and the inmates could unlock the cells doors.  Additionally, there was a hole in the MCDC roof that inmates used to exit the MCDC, obtain contraband, and return to the MCDC.  Finally, MCDC staff were also bringing in contraband.  The Federal Bureau of Prisons and the State Board of Corrections had to be involved to clean up the MCDC.  According to Sheriff Stovall, his team worked in "crisis mode" seven days a week during this time to get the MCDC cleaned up.  There has been a one hundred percent turn over of staff at the MCDC since Sheriff Stovall took control.

### Lewis Giles

Giles worked as a correctional officer at the MCDC from January 5, 2009 through September 2011.  Giles was one of the officers that responded to the Mitchell Attack on March 5, 2009.  Giles testified he took pictures of Williams after the attack.  Giles also testified that he turned the pictures he took of Williams in to Cecil White.  Further, Giles testified he did not prepare an incident report on the Mitchell Attack.

Giles also testified that after the attack, Mitchell was locked down in a diciplinary pod and Williams was put in a holding cell up front.  According to Giles, it was difficult to find a place in the MCDC for Williams because of the nature of his charge.  Giles testified Mitchell was back in the pod when Giles returned Williams to the pod.

### Gary Turner

Gary Turner was the Major at the MCDC for one year beginning on January 1, 2009.  Turner testified there was zero tolerance of inmate altercations at the MCDC in March 2009.  If an altercation occurred, the inmates were separated and moved out of their pods. According to Turner,

Mitchell was locked down in the Super Max (24 hour lockdown within the MCDC established by Turner) after the March 5, 2009 incident.  Mitchell was one of the first inmates to be placed in the Supermax.  Turner also testified Williams was a model prisoner, and when Turner spoke with him after the Mitchell Attack, Williams was mostly concerned with getting his job at the MCDC back. Turner, as head of security, testified that he had a zero tolerance policy for altercations among inmates at the MCDC.  As a result of the Mitchell Attack, Mitchell was one the first MCDC inmate to be moved to the "Supermax."  The Supermax was a twenty-four hour a day lock down pod within the MCDC created by Turner after he came on board at the MCDC.

Additionally, Turner testified when he started working at the MCDC, in January 2009, the inmates had control of the detention center.  The detention center itself was in bad condition, the employees were not properly trained, and the employees treated the inmates like friends.

### Charles Don Thornell

Thornell is a lieutenant with the Miller County Sheriff's Office.  In 2008 and 2009 Thornell was an investigator for Miller County Sheriff's Office.  On September 26, 2008, Thornell took a statement from Williams regarding the Duke Attack.  Thornell testified that he was notified about the Duke attack by Williams himself.  Williams was able to get Thornell's attention while Thornell was over at the MCDC.

Thornell testified he was unable to identify the attacking inmates other than Duke. According to Thornell, no video existed because most of the cameras at the MCDC did not work at that time.  Thornell's September 30, 2008 Offense Report supports this testimony.  *See* Defendants' Ex. 2.  Thornell testified if a video of the Duke Attack existed he would have watched it as part of his investigation but none existed.  Thornell also testified he could not recall if there was an incident

report on the Duke Attack, but if there was, he had it in his files at the CID.[9]

Thornell testified that after the investigation, he charged Duke with simple assault and battery in the third degree based on the fact that Williams' injuries were not severe.  *See* Defendants' Exs. 3-4.  Thornell also testified his responsibility was to investigate the Duke attack for purposes of criminal charges.  Thornell did not have any control over diciplinary actions at the MCDC.

**Wayne Walker**

Walker worked at the MCDC for three months starting in September 2008.  On September 20, 2008, he was working on the floor with Ballard.  Walker testified that he did not recall the details surrounding the Duke Attack but did remember Williams was attacked.  Further, Walker testified the only facts he can remember are those in his September 20, 2008 incident report.  Walker read his incident report to the Court:

> Wayne Walker Jr. stopped down to Max Echo to let officer CO Ballard out of the pod who in which could not get out.  So thereafter 3 offenders which names are unknown to me charged into Max Echo and assaulted offender Williams, Michael and afterwards ran back inside of the pod as if nothing happened.  So then offender Williams was taken to medical to get treated and then was placed in holding cell #6 by Rachel Jones.

Court's Ex. 3 (errors in the original).

Walker went on to testify regarding the Duke Attack.  Walker first testified that if Ballard radioed him to open E-Pod door, Walker would have then radioed the control room and asked whoever was working there to open E-Pod door.  Further, Walker testified he could not open E-Pod door himself.  Walker also testified he shut the E-Pod door after he let Ballard out, and when the pod doors shut they automatically lock.  Walker then testified he does not remember whether he shut the

---

[9] At this point the Court directed defense counsel to coordinate with Thornell to locate any reports or records on the Duke attack and submit any documents located to the Court.

door after he got Ballard out of E-Pod.  Walker then reverted back to his original testimony that it was standard practice to shut the pod doors so he must have shut the E-Pod door after he got Ballard out.  Walker then testified that the only way Duke and the other inmates entered E-Pod was if another officer opened the door.

Walker could not recall when Duke and the other inmates entered E-Pod.  According to Walker, someone must have opened the door for Duke and the other inmates.  Walker also testified that if he were standing in the hallway when the inmates came towards E-Pod, he would have been able to see them coming, however, Walker could not recall where he was standing when the inmates came into E-Pod.  Walker testified further that he did see the assault on Williams and to have seen it, he must have been standing at the E-Pod door.  Walker then testified that Duke and the other inmates must have gotten by him while he was standing at the E-Pod door.  Walker also testified an officer must have let Duke and the other inmates out of their pod.

## II.    DISCUSSION

As an initial matter, the Court notes it was never able to effect service on Defendant Sheila Abraham-Drake as Williams was unable to provide a current and accurate address for Mrs. Drake.[10]

---

[10] Williams initially named "Officer Drake" as a Defendant.  ECF No. 1.  The Court was informed when service was attempted that Officer Drake was deceased.  ECF No. 12.  The Court granted Williams' Motion to substitute Officer Drake's estate administrator or representative as a defendant in this matter.  ECF No. 42.  Williams identified Officer Drake's administrator as Sheila Abraham-Drake on April 20, 2011, but he did not provide the Court with an address for service on Mrs. Drake.  ECF No. 48.  The Court located a last known address for Mrs. Drake, through its own research, and ordered service on her at that address.  ECF No. 51.  Service on Mrs. Drake was sent by certified mail and the Court received the receipt for delivery on June 10, 2011.  ECF No. 60.  The receipt was signed by Ella Richardson—a non-party in this case.  ECF No. 60.  Mrs. Drake failed to answer the Complaint.  The Court issued an Order to Show Cause on September 2, 2011, directing Mrs. Drake to show cause why default judgment should not be entered against her for failing to answer the Complaint.  ECF No. 74.  The Show Cause Order was sent to Mrs. Drake's last known address but it was returned as undeliverable mail.  ECF No.

Therefore, the Court recommends Sheila Abraham-Drake be dismissed from this action without prejudice for lack of service.  Fed. R. Civ. P. 4(m); see also Lee v. Armontrout, 991 F.2d 487, 489 (8th Cir. 1993) (it is the responsibility of a prisoner proceeding *pro se* and *in forma pauperis* in a section 1983 action to provide the court with an address for proper service).

Williams asserts a claim of failure to protect based on the September 20, 2008 attack (the Duke Attack) and a March 9, 2009 attack (the Mitchell Attack) by fellow inmates while he was housed at the MCDC.  Williams implicates Defendants Rambo, Nickleson, Simmons, Jones, Ballard, Walker, and Thornell in the Duke Attack and Defendants Nickleson, White, Stovall, Turner and Giles in the Mitchell Attack.

"Prison officials have a duty to protect prisoners from violence at the hands of other prisoners." Holden v. Hirner, 663 F.3d 336, 340-41 (8th Cir. 2011) (citing Farmer v. Brennan, 511 U.S. 825, 833 (1994)).  However, not "every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety." Farmer, 511 U.S. at 834.  The claims of pretrial detainees are analyzed under the Due Process Clause of the Fourteenth Amendment while the claims of convicted prisoners are analyzed

---

77.  Williams filed a Motion for Default Judgment as to Sheila Abraham-Drake on October 12, 2011.  ECF No. 79.  On October 14, 2011, the Court determined that the docket was unclear as to whether Mrs. Drake was given proper notice regarding service or the Court's Order to Show Cause.  ECF No. 82.  For this reason, the Court reissued the Order to Show Cause to Drake, and directed the U.S. Marshal to personally serve Mrs. Drake with the Order to Show Cause and Amended Complaint.  ECF No. 82.  On October 18, 2011, service was returned unexecuted on Mrs. Drake.  The U.S. Marshall noted on the summons that Mrs. Drake did not live at the address, had never lived at the address, and the occupant did know where Mrs. Drake currently resided.  Additionally, the Marshall noted, "[i]t is believed that Ms. Drake never received the process in May 2011." ECF No. 83.  Accordingly, the Court denied Williams' Motion for Default Judgment and directed him to provide the Court with Mrs. Drake's current address by January 28, 2012.  ECF No. 85.  Williams never responded with a current address for Mrs. Drake.

under the Eighth Amendment's prohibition of cruel and unusual punishment.  Holden, 663 F.3d at 341 (citation omitted).  "This makes little difference as a practical matter [since] [p]retrial detainees are entitled to the same protection under the Fourteenth Amendment as imprisoned convicts receive under the Eighth Amendment."  Kahle v. Leonard, 477 F.3d 544, 550 (8th Cir. 2007).

To prevail on his failure to protect claims, Williams must first prove he was "incarcerated under conditions posing a substantial risk of serious harm."  Farmer, 511 U.S. at 834.  "This is an objective requirement to ensure the deprivation is a violation of a constitutional right."  Holden, 663 F.3d at 341 (citation omitted).  Second, Williams must "establish the prison officials were deliberately indifferent to his health or safety.  This is a subjective requirement, mandating the prisoner prove the official both knew of and disregarded an excessive risk to inmate health or safety." Id. (citation and internal quotation marks omitted).  Furthermore, "[c]laims under the Eighth Amendment require a compensable injury to be greater than *de minimis*," however, "[n]o clear line divides *de minimis* injuries from others."  Irving v. Dormire, 519 F.3d 441, 448 (8th Cir. 2008).

The evidence presented in this case is sufficient to establish that Williams was incarcerated under conditions posing a substantial risk of serious harm.  The testimony indicates the MCDC staff were not in control of the MCDC—inmates could open their own cell and pod doors, and come and go through a hole in the roof of the MCDC; guards were letting inmates out of their cells and pods; contraband was coming into the MCDC through the hole in the roof and also through guards; and the MCDC cameras and panic buttons were not functional.  Additionally, the staff at the MCDC either had no training and policy and procedures to follow, or were unsupervised and

allowed to disregard their training and the MCDC policy and procedures.  The atmosphere at the MCDC during the times at issue here was both chaotic and unsafe subjecting Williams to conditions posing a substantial risk of serious harm.

Next, it must be determined whether there was sufficient evidence to establish the Defendants knew of and were deliberately indifferent to the risk of harm to Williams.  Negligence alone is insufficient to meet the second prong, instead, the official must "recklessly disregard a known, excessive risk of serious harm to the inmate."  Davis v. Oregon County, 607 F.3d 543, 549 (8th Cir. 2010).  "The level of culpability required to demonstrate deliberate indifference on the part of prison officials is equal to criminal recklessness."  Holden, 663 F.3d at 343.

The Court will analyze the issue of deliberate indifference first in regards to the Duke Attack and then the Mitchell Attack.

***Duke Attack***

Williams testified that Defendants Ballard, Walker, Rambo, Nickleson, Simmons, Jones, and Thornell are liable for failing to protect him from Duke and the other inmates on September 20, 2008.

A.     Ballard

The testimony regarding Ballard's role in the events surrounding the Duke Attack varies greatly.  Additionally, Ballard's testimony at the hearing differs from his account of the Duke Attack in the incident report he completed the day of the attack (Court's Ex. 2) and the Answer Ballard filed with the Court on August 12, 2011 (ECF No. 68).  Considering these discrepancies and the evidence presented as a whole, the Court finds Williams' testimony the most credible concerning the facts surrounding the Duke Attack.

24

Accordingly, the evidence shows Ballard allowed an inmate named Cortez into E-Pod on September 18, 2008.  The same day, Williams informed Ballard that Cortez walked around E-Pod with a big stick and that Williams' cell mate informed him inmates in A-Pod wanted Williams "jumped."  On September 19, 2008, Williams informed Ballard that Duke threatened him.

On September 20, 2008, Ballard radioed to have E-Pod door opened and then stood by and allowed Duke and other inmates to enter E-Pod.  Ballard also did not intervene when Duke and the other inmates attacked Williams.  The evidence also shows Ballard was working on the Max End[11] on September 20, 2008 at approximately 5:20 with Walker when Cummings, the officer in the central control room, received a radio call from Ballard and Walker to open all pod doors in the Max End.

Based on this evidence, it is clear that Ballard was aware that Duke had previously threatened Williams when Ballard opened E-Pod door and allowed Duke and the other inmates into E-Pod.  Further, the fact that Ballard then stood by and allowed Duke and the other inmates to attack Williams allows the Court to infer it was Ballard's intention, in opening the door, to allow Williams to be attacked.  See Wade v. Haynes, 663 F.2d 778, 786 (8th Cir. 1981) ("deliberate intent may be predicated on factual circumstances which are so egregious and reckless that the natural consequence of the actor's conduct implies the requisite malicious intent to do wrong") (citing Estelle v. Gamble, 429 U.S. 97, 105-06 (1976)).  The evidence here "portrays unjustifiable, actionable inmate-endangering conduct."  Irving v. Dormire, 519 F.3d 441, 447 (8th Cir. 2008) (officer opened the plaintiff's cell door in order to allow fellow inmate access to assault the

---

[11] It is the Court's understanding that "Max End" is a reference to the end of the jail containing E-Pod.

25

plaintiff).  Ballard not only failed to protect Williams, he brought the substantial risk of harm to him.  Id.  The evidence clearly shows Ballard intentionally, or at the very least, recklessly disregarded a known, excessive risk of serious harm to Williams, and thus, was deliberately indifferent to Williams' safety.  See Davis, 607 F.3d at 549.

B.     Walker

As stated above, the Court credits Williams testimony on the events surrounding the Duke Attack.  Additionally, Walker's testimony is unreliable.  Walker testified that he did not remember anything about the Duke Attack other than what was written in the incident report he completed on September 20, 2008.

Even crediting Williams' testimony, however, there is no evidence supporting a failure to protect claim against Walker.  Williams did not mention Walker in his testimony or present any evidence against him.  There is no evidence showing Walker was aware of any threats to Williams, and—crediting Williams testimony—it was Ballard that opened (or radioed to open) E-Pod door and allowed the inmates to attack him, not Walker.  While the Court does not doubt that Walker witnessed the Duke Attack, there is no evidence supporting deliberate indifference on Walker's part.

C.     Rambo and Nickleson

As sheriff and jail administrator, Rambo and Nickleson are only liable for their own conduct and cannot be held accountable for the misbehavior of their agents under a theory of respondeat superior or supervisor liability.  Whitson v. Stone County Jail, 602 F.3d 920, 928 (8th Cir. 2010).  However, a supervisor may be found liable under section 1983 if she is aware of "a substantial risk of serious harm" even if she is not aware that the harm has actually occurred.

26

Kahle v. Leonard, 477 F.3d 544, 52 (8th Cir. 2007) (citing Farmer v. Brennan, 511 U.S. at 842). To establish supervisor liability, the plaintiff must show a failure to train or supervise caused his injury.  Moore v. City of Desloge, 647 F.3d 841, 849 (8th Cir. 2011).  The Eighth Circuit Court of Appeals has stated, "[t]he supervisor must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye [to it]."  Boyd v. Knox, 47 F.3d 966, 968 (8th Cir. 1995).  "The question of whether the official knew of the risk is subject to demonstration, like any other question of fact, by inference from circumstantial evidence."  Spruce v. Sargent, 149 F.3d 783, 786 (8th Cir. 1998).  Therefore, if the plaintiff presents evidence of "very obvious and blatant circumstances" showing the supervisor knew of the risk of harm to him, then the fact finder may infer that the supervisor "must have known" of the risk.  Id.

The evidence shows Ms. Cheatham called Rambo on September 17, 2008 to inform her of the threat Duke made to Williams.  Additionally, Rambo was aware the inmates were jamming the pod doors with toothpicks and toothbrushes to stop the doors from locking. According to Rambo, if an inmate wanted to get out of his pod he could do so.

It is unclear from the evidence whether Nickleson was informed of Duke's threats on Williams.  Nickleson, however, knew her officers were allowing inmates to escape through the roof of the MCDC and were also bringing contraband into the MCDC.  She also knew inmates were jamming the locks on their cell doors.  Further, given the totality of the evidence presented, the Court cannot credit Nickleson's testimony that she had no knowledge that inmates were getting out of their pods/cells on their own or her assertion that the cameras worked in the MCDC.

Rambo and Nickleson had a duty to protect prisoners from violence at the hands of other prisoners.  The evidence presented establishes that both Rambo and Nickleson were aware of the

serious risk to Williams' safety posed by the chaotic and unsupervised state of the MCDC.  See Riley v. Olk-Long, 282 F.3d 592 (8th Cir. 2002) (court held it could be inferred from the evidence—security director was aware that sexual misconduct involving guards and inmates was a concern, knew of investigations into sexual misconduct by the guard, but allowed the guard to resume his prison duties—that security director recognized guard was a problem employee who posed a substantial risk of harm).  Rambo and Nickleson failed to take the necessary remedial, corrective, or protective measures despite their knowledge of the very serious problems existing at the jail and the direct threat against Williams.  Rambo and Nickleson's failure to ensure the MCDC employees were being trained and supervised created the chaotic and dangerous situation existing in the jail.  See e.g., Andrews v. Fowler, 98 F.3d 1069, 1078 (8th Cir. 1996) (Plaintiff must show the failure to train or supervise caused the injury).  Furthermore, while the evidence is unclear as to whether Rambo and Nickleson explicitly condoned the activities of the MCDC guards and inmates, they surely turned a blind eye to the happenings at the MCDC.  Therefore, the evidence shows Rambo and Nickleson, in their individual capacities, were deliberately indifferent to Williams' safety.  See Boyd v. Knox, 47 F.3d 966, 968 (8th Cir. 1995);  see also Hahn v. McLey, 737 F.2d 771, 773 (8th Cir. 1984) ("a supervisor may be liable for the acts of a subordinate if injury is inflicted upon the plaintiff as a result of a breach of the supervisor's duty to train, supervise, or control the actions of subordinates.")

Furthermore, Rambo was aware Duke threatened Williams and failed to act to protect Williams from this imminent threat.  The Court recognizes that "threats between inmates are common and do not, under all circumstances, serve to impute actual knowledge of a substantial risk of harm," Jackson v. Everett, 140 F.3d 1149, 1152 (8th Cir. 1998) (quoting Prater v. Dahm,

89 F .3d 538, 541 (8th Cir. 1996).  Here, however, Rambo knew of Duke's threat and also knew Duke had the ability to carry out this threat because the inmates at the MCDC could move about freely by jamming and opening pod and cell doors.  The Court finds Rambo's inaction, by failing to act to protect Williams from Duke, constituted deliberate indifference to Williams safety.

Moreover, with regards to Nickleson, placing inmates in situations that inherently present substantial risks to their safety, even without knowledge of a direct threat of harm, may amount to deliberate indifference.  See Whitson v. Stone County Jail, 602 F.3d 920, 294-5 (8th Cir. 2010) (a fact finder could find that jailers placing two inmates of the opposite sex next to one another in an isolated rear cage of a dark transport van, where there was loud music and inadequate observation, amounts to deliberate indifference to the female inmate's safety, even though, the female inmate made no indication she was fearful of the male inmate prior to transportation). Here, Nickleson allowed Williams, an offender charged with a sex crime, to be housed in an environment where inmates could get out of their cells and move around freely from pod to pod. Additionally, Nickleson was aware her officers at the MCDC were not enforcing rules or properly supervising the inmates.  Even without actual knowledge of Duke's threat, Nickleson's knowledge of the situation at the MCDC coupled with Williams' status as a charged sex offender, amounts to deliberate indifference to Williams' safety.

The Court also recognizes the risk inherent in detention facilities, and the Eighth Circuit Court of Appeals direction to give "prison officials wide-ranging deference . . . to preserve internal order and discipline and to maintain institutional security."  Jackson, 140 F.3d 1149, 1152-3 (8th Cir. 1998) (internal quotations omitted).   Here, however, the evidence does not support a belief that Rambo or Nickleson were attempting to preserve internal order and discipline, or maintain

institutional security at the MCDC, when they failed to protect Williams from the Duke Attack.

Accordingly, the Court finds the evidence shows Rambo and Nickleson were deliberately indifferent to a substantial risk of serious harm to Williams.

D.   Simmons and Jones

Williams testified that Simmons and Jones are liable for failing to protect him because they failed to complete a report on the Duke Attack.  First, the Court notes Jones did complete a report on the Duke Attack.  *See* Court's Ex. 4.  Secondly, failing to complete a report does not state a claim for a constitutional violation.  Additionally, Simmons and Jones had no personal involvement in the Duke Attack.  Mark v. Nix*, 983 F.2d 138, 139–40 (8th Cir. 1993) (Section 1983 liability requires some personal involvement or responsibility).  Finally, there is no evidence that Simmons or Jones were deliberately indifferent to a substantial risk of harm to Williams on September 20, 2008.  In fact, the evidence does not indicate that either Simmons or Jones were aware of Cortez' or Duke's threats to Williams, or that the inmates could open the doors at the MCDC on their own.  Furthermore, there is no evidence indicating Simmons or Jones played any role in allowing Duke and the other inmates into E-Pod on September 20, 2008.

Accordingly, the Court finds the evidence does not support a finding that Simmons and Jones were deliberate indifferent to Williams' safety.

E.   Thornell

The evidence shows Thornell played no role in the circumstances leading up to and surrounding the Duke Attack.  Instead, Thornell only investigated the Duke Attack after it occurred.  Williams testified that Thornell is liable because he did not investigate the Duke Attack thoroughly, only issued a warrant for Terrell Duke, and did not punish the other attacking inmates.

To establish a violation of his Fourteenth Amendment rights based on Thornell's investigation of the Duke Attack, Williams must establish Thornell intentionally or recklessly failed to investigate the attack.  See Brockinton v. City of Sherwood, 503 F.3d 667, 672 (8th Cir. 2007) (a failure to investigate must shock the conscience to support a constitutional violation).  A negligent failure to investigate does not rise to the level of a constitutional violation.  Id.

The evidence shows Thornell did investigate the Duke Attack—he took statements from Williams, and reviewed the incident reports completed by the MCDC staff.  The evidence also shows Thornell charged Terrell Duke with simple assault and battery in the third degree as a result of this investigation.  Additionally, the evidence shows there is no video of the Duke Attack, and neither Williams nor the MCDC employees identified the other attacking inmates.  Consequently, Thornell was unable to identify the other attacking inmates.  This evidence does not establish intentional or reckless failure to investigate.  Id.  The evidence indicates Thornell conducted the investigation to the best of his ability given the limited resources provided to him by the MCDC.  Williams mere disagreement with the outcome of the investigation is insufficient to establish a violation of his constitutional rights.

Accordingly, the Court finds the evidence does not support a failure to protect or to investigate claim against Thornell.

***Mitchell Attack***

Williams testified that Defendants, Nickleson, White, Stovall, Giles, and Turner, in their individual capacities, are liable for failing to protect him from Mitchell on March 5, 2009, however, Williams did not prove any of these Defendants knew of and were deliberately indifferent to a substantial risk of Mitchell attacking Williams.

A.   White, and Giles

There is no evidence that Mitchell posed a known substantial risk of harm to Williams nor that White or Giles were aware of any risk of harm to Williams on March 5, 2009.  To the contrary, the evidence presented shows that the Mitchell Attack was a surprise, and that Mitchell and Williams had no previous encounters or problems before March 5, 2009.  Further, Williams testified he did not file any grievances or inform any of the Defendants that he feared Mitchell would harm him because Williams did not fear an attack by Mitchell.  Finally, Mitchell and Williams were housed in the same pod for three weeks prior to the Mitchell Attack with no issues. The evidence before the Court indicates that White and Giles had no knowledge of a serious risk of harm to Williams on March 5, 2009, and therefore, Defendants were not deliberately indifferent to Williams' safety.  See Tucker v. Evans, 276 F.3d 999, 1002 (8th Cir. 2002) (a guards failure to protect inmate from a surprise attack by a fellow inmate did not amount to deliberate indifference).

B.   Nickleson

Williams also claims that Nickleson is liable for failing to protect him from Mitchell because she knew Mitchell was a problem inmate and that he often got in fights.  Williams claims Nickleson should not have moved Mitchell into Williams' pod based on this knowledge.  However, knowledge that an inmate has a history of altercations is insufficient to establish deliberate indifference.  See Holden, 663 F.3d at 341 ("An inmate's history of violence alone is insufficient to impute to prison officials subjective knowledge of the inmate's danger to harm other inmates.") Further, as explained above, Nickleson, just as White and Giles, had no actual knowledge of a serious risk of harm to Williams safety on March 5, 2009.  See Tucker, 276 F.3d at 1002.  Lastly,

the testimony indicates Nickleson was no longer the MCDC administrator in March 2009, and there is no evidence indicating Nickleson, as a correctional officer, made the decision to place Mitchell into the pod with Williams.

      C.    <u>Sheriff Stovall and Turner</u>

Williams claims Turner failed to protect him from the Mitchell attack because Turner's officers were not at the doors of Williams' pod, where they should have been, when Mitchell Attacked him, and Stovall failed to respond to Williams' complaints after the attack.

First, the officers' failure to properly supervise the pod cannot establish deliberate indifference in this situation. <u>See Tucker</u>, 276 F.3d at 1002 (failure to properly supervise the barracks without actual knowledge that one of the occupants of the barracks posed a risk to another occupant does not establish deliberate indifference). As previously noted, the evidence shows no one in the MCDC was aware of a substantial risk of serious harm to Williams on March 5, 2009.

Secondly, Williams does not have an independent constitutional right to a grievance procedure. *See Lomholt v. Holder,* 287 F.3d 683, 684 (8th Cir. 2002) (quoting *Buckley v. Barlow,* 997 F.2d 494, 495 (8th Cir.1993)). A jail's failure to process an inmate's grievances, without more, is not actionable under Section 1983. *Buckley,* 997 F.2d at 495. Therefore, Sheriff Stovall's failure to respond to Williams letter does not state a constitutional violation.

As explained above, Turner and Sheriff Stovall also cannot be held vicariously liable for the actions of their officers unless the evidences shows they was "aware of a substantial risk of serious harm." <u>Kahle</u>, 477 F.3d at 551-52. Additionally, Williams must show Turner's failure to train or supervise the officers caused the injury. <u>See Moore</u>, 647 F.3d at 849. Further, a supervisor's inaction must amount to deliberate indifference. <u>See Meloy</u>, 302 F.3d at 849. Lastly,

the supervisor must facilitate, approve, condone, or turn a blind eye to the conduct.  Boyd v. Knox, 47 F.3d at 968.

The evidence shows that Sheriff Stovall and Turner took control of the MCDC on January 1, 2009.  Additionally, the evidence shows Sheriff Stovall and Turner were putting in extreme hours to gain control over the situation at the MCDC, and they were also turning over the staff at the MCDC.  Finally, the evidence shows Turner had a zero tolerance policy for inmate altercations and Mitchell was punished with twenty-four-hour lock down for the attack on March 5, 2009.  It is clear from the evidence that Sheriff Stovall and Turner were aware of the situation at the MCDC when they took control in January 2009, however, it is also clear that Sheriff Stovall and Turner were taking aggressive actions to rectify the situation.  Therefore, Sheriff Stovall and Turner cannot be held liable as supervisors for failing to protect Williams because they were in no way facilitating, approving, condoning or turning a blind eye to situation at the MCDC.  See Boyd v. Knox, 47 F.3d 966, 968 (8th Cir. 1995).  Furthermore, there is no evidence Sheriff Stovall or Turner, was aware of a serious risk of harm to Williams on March 5, 2009.  See Tucker, 276 F.3d at 1002.

The evidence presented does not support a claim that Williams' constitutional rights were violated on March 5, 2009 by Defendants failing to protect him from the Mitchell Attack.

### *Official capacity clams*

Williams has also brought claims against Defendants in their official capacities.  "A suit against a government officer in his official capacity is functionally equivalent to a suit against the employing governmental entity."  Veatch v. Bartels Lutheran Home, 627 F.3d 1254, 1257 (8th Cir. 2010).  Thus, the claims against Defendants, in their official capacities, are the legal equivalent of

claims against Miller County.  To establish Miller County's liability under § 1983, Williams "must show that a constitutional violation was committed pursuant to an official custom, policy, or practice of the governmental entity." Moyle v. Anderson, 571 F.3d 814, 817 (8th Cir. 2009) (citing Monell v. N.Y. Department of Social Services, 436 U.S. 658, 690-92 (1978).

The Eighth Circuit has delineated two basic circumstances warranting municipal liability: (1) "where a particular municipal action itself violates federal law, or directs an employee to do so;" and (2) where a facially lawful municipal action has led an employee to violate a plaintiff's rights and the municipal action was taken with deliberate indifference as to its known or obvious consequences." Seymour v. City of Des Moines, 519 F.3d 790, 800 (8th Cir.2008) (internal citation and quotations omitted).  Additionally, "inaction or laxness can constitute government custom if it is permanent and well settled.  Such a government custom or laxness or inaction must be the moving force behind the constitutional violation." Tilson v. Forrest City Police Department, 28 F.3d 802, 807 (8th Cir. 1994) (citing Monell, 436 U.S. at 691).

The Court need only address Williams' official capacity claims regarding the Duke Attack as it previously explained the Mitchell Attack did not violate Williams' constitutional rights.

In this case, the credible evidence establishes that while there may have been training and written policies or procedures for various aspects of running the MCDC in September 2008, those policies and procedures were not being implemented.  The lack of training of jail staff, or enforcement of training and policies and procedures, coupled with the living conditions, the ability of the inmates to move in and out of pods and the facility freely, and the ease of obtaining contraband resulted in unsafe conditions at the MCDC.  See e.g., Bordanaro v. McLeod, 871 F.2d 1151, 1162 (1st Cir. 1989) ("[T]he failure of the Mayor and Chief of Police to institute a minimally

acceptable program of recruitment, training, supervision or discipline amount to a deliberate indifference to the constitutional rights of the city's inhabitants.").  The evidence established a pattern of inadequate supervision and safety measures which left jail staff ill prepared, or unwilling, to deal with the duties necessary to maintain custody, control, and the safety of the detainees.  Together, these inadequacies resulted in the chaotic and  dangerous atmosphere at the MCDC and a staff ill-prepared, ill-equipped, or unwilling to perform the duties of correctional officers.  Miller County's response was to do nothing, or to do little, when circumstances required active steps to be taken.  Miller County's inaction was the moving force behind the Duke Attack. See e.g. Oviatt v. Pearce, 954 F.2d 1470, 1474 (9th Cir. 1992) ("a local governmental body may be liable if it has a policy of inaction and such inaction amounts to the failure to protect constitutional rights") (citing City of Canton v. Harris, 489 U.S. 378, 388 (1989)).

Accordingly, the Court finds the evidence supports an official capacity claim against Rambo, Nickleson, and Ballard for failing to protect Williams.

### Qualified Immunity

Having found the evidence shows Ballard, Rambo, and Nickleson violated Williams' constitutional rights by failing to protect him from the Duke Attack, the Court now turns to the issue of qualified immunity.[12]

"Qualified immunity shields government officials from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known."  Brown v. City of Golden Valley, 574 F.3d 491, 495 (8th

---

[12] Ballard, Rambo, and Nickleson asserted qualified immunity in their Answer.  ECF No. 14, p. 2.

Cir. 2009).  Qualified immunity is available only to government employees sued in their individual capacity.  Johnson v. Outboard Marine Corp., 172 F.3d 531, 535 (8th Cir. 1999).  The qualified immunity inquiry consists of two questions: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct."  Johnson v. Carroll, 658 F.3d 819, 825 (8th Cir. 2011).  It is to the trial court's discretion which prong will be analyzed first, Id., and the answer to both of these questions must be affirmative to entitled the official to qualified immunity, Langford v. Norris, 614 F.3d 445, 459 (8th Cir. 2010).

As discussed above, the facts establish a failure to protect claim against Ballard, Rambo, and Nickleson. Moreover, the evidence in this case demonstrate egregious action and inaction on the part of Ballard, Rambo, and Nickleson in failing to protect Williams from the Duke Attack. An inmate's right to be free from attack by fellow prisoners was clearly established in 2008, such that a reasonable person standing in Ballard, Rambo, or Nickleson's shoes would have understood that the failure to take necessary steps to alleviate the risk of attack violated Williams' rights.  See e.g., Prater v. Dahm, 89 F.3d 538, 541 (8th Cir. 1996) (it is well settled that the Eighth Amendment imposes a duty on prison officials to protect prisoners from violence at the hands of other prisoners).  Ballard, Rambo, and Nickleson, therefore, are not entitled to qualified immunity.

*Damages*

The issue now becomes what relief Williams should be awarded against Ballard, Rambo, and Nickleson in both their individual and official capacities. Compensatory damages under section 1983 are governed by the general compensation theory.  See Carey v. Piphus, 435 U.S. 247, 255 (1978). In *Carey*, the Supreme Court noted that damages are available under section 1983 for

actions found to have violated the constitution and to have caused compensable injury.  Id.
Compensatory damages cannot be awarded for the violation of a constitutional right alone, instead,
there must be an actual injury resulting from the violation to warrant compensatory damages.  Id.
at 264.  See also Memphis Community School Dist. v. Stachura, 477 U.S. 299, 307 (1986)
("[w]here no injury was present, no compensatory damages could be awarded.") (internal
quotations omitted).  In the common law system of recovery compensatory damages may include
out-of-pocket loss and other monetary harm, as well as, impairment of reputation, personal
humiliation, and mental anguish and suffering.  See Memphis Community School Dist., 477 U.S.
at 307.  This common law system of recovery was adopted by Congress in establishing liability
for "constitutional torts," therefore, damages under section 1983 are meant to "compensate persons
for injuries that are caused by the deprivation of constitutional rights."  Id. at 307 (quoting Carey,
435 U.S. at 254).

　　　　Prisoners, however, must not only show an injury, but a physical injury caused by the
constitutional violation.  Pursuant to the Prison Litigation Reform Act, "[n]o Federal civil action
may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental
or emotional injury suffered while in custody without a prior showing of physical injury."  42
U.S.C. § 1997e(e).  See also  Royal v. Kautzky, 375 F.3d 720, 723 (8th Cir. 2004) (the PLRA
limits recovery for mental or emotional injury in all federal actions brought by prisoners.).

　　　　Here, according to Williams, he suffered injury to his head, back, and hand in the assault.
This is supported by the medical records admitted.  See Defendants' Exs. 5-6.  Williams also
indicated he suffered a cut to his shin and his tooth was knocked loose and later had to be pulled
by the jail dentist.  There were no medical records to support this testimony.  Further, Williams

38

testified he still suffers from blurry vision and headaches due to the injuries he received in the Duke Attack. Lastly, Williams testified he now has to wear glasses and his back hurt for approximately one week after the incident. The evidence presented satisfies the physical injury requirement of § 1997e(e).

Accordingly, the Court recommends that Williams be awarded compensatory damages in the amount of $5,000 for his physical injuries and pain and suffering. Cf. Mitchell v. Neff, Civil No. 09-cv-04071, 2012 WL 2449863 (W.D. Ark. May 30, 2012) (awarding $5,000 in compensatory damages for failing to protect inmate from attack by fellow inmates—plaintiff suffered several cuts to his head and bruises, cuts, and abrasions to his arms); Palton v. Jackson, Civil No. 06-cv-00195, 2009 WL 2762739 (E.D. Ark. Aug. 28, 2009) (district court denied renewed motion for judgment as a matter of law holding their was sufficient evidence to warrant $10,000 compensatory damage award for failing to protect inmate from sexual assault by correctional officer); Boesing v. Spiess, 540 F.3d 886, 889-90 (8th Cir. 2008) (upholding $5,000 compensatory award to arrestee who, while handcuffed, was sprayed with mace and struck on head and back with baton, sustaining a laceration on his head and deep bruises on his back and side); Riley v. Olk-Long, 282 F.3d 592 (8th Cir. 2002) (upheld $15,000 compensatory award against security director and warden for failing to protect female inmate from rape by male correctional officer with a history of sexual infractions); Williams v. Omodt, 640 F. Supp. 120, 123 (D. Minn. 1986) (awarding inmate $5,000 in actual damages for bruises, contusions, swelling, and considerable pain he sustained from being choked, forced to the ground, and hit several times by officer); Wade v. Haynes, 663 F.2d 778 (8th Cir. 1981) ($25,000 compensatory damage award for placing an inmate—that was susceptible to physical abuse from members of the general

39

population—in a segregation cell with two inmates from the general population, one of whom had history of fighting, which resulted in the susceptible inmate being beaten and sexual assaulted). The Court also recommends that Ballard, Rambo, and Nickleson be required to pay the district court filing fee of $350 (ECF No. 6) that has been assessed against Williams. Ballard, Rambo, and Nickleson, in their individual and official capacities, should be held jointly and severally liable for the $5,000 in compensatory damages and the $350 filing fee.

An award of punitive damages against Ballard, Rambo, and Nickleson in there official capacity may not be made. Such an award would be the equivalent of an award against Miller County and is precluded by the Supreme Court's ruling in City of Newport v. Fact Concerts, Inc., 453 U.S. 247 (1981). Further, the facts of this case do not support the imposition of punitive damages against Rambo and Nickleson in their individual capacities. The facts do, however, support imposition of punitive damages against Ballard in his individual capacity.

In section 1983 cases, it has been held that punitive damages are appropriate "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." Walters v. Grossheim, 990 F.2d 381, 385 (8th Cir. 1993) (internal quotation marks and citation omitted). As explained above, the evidence here shows Ballard intentionally disregarded Williams' safety when he allowed those inmates into Williams' pod, or at the very least, demonstrated reckless and callous indifference to Williams' safety. The Court now must consider the two purposes of punitive damages: (1) to punish willful or malicious conduct; and (2) deter future unlawful conduct. Royal v. Kautzky, 375 F.3d 720, 724 (8th Cir. 2004).

As explained above, the Court finds Ballard, at the very least, acted with reckless and

callous disregard to a known danger to Williams.  Even though there was no evidence of ill will or spite by Ballard against Williams, Ballard's reckless and callous disregard of the known dangers indicates a finding of malice.  See Wade v. Haynes, 663 F.2d 778, 786 (8th Cir. 1981).  The Court respects the fact that correctional officers have difficult and dangerous jobs that require split-second decisions in situations where their safety or the security of the jail is at risk.  Here, however, Ballard's knowing decision to allow the attacking inmates into E-Pod was unconscionable, and the evidence in no way suggest Ballard's decision was aimed to protect himself or maintain security of the MCDC.

The Court finds that punitive damages are warranted to punish Ballard and to deter him, as well as other correctional officers, from such unconscionable conduct in the future.  Accordingly, the Court recommends Ballard, in his individual capacity, shall be liable to Williams for $5,000 in punitive damages.  Cf. Riley v. Olk-Long, 282 F.3d 592 (8th Cir. 2002) (upheld $5,000 punitive award against security director and $25,000 against the warden for failing to protect female inmate from rape by male correctional officer with a history of sexual infractions); Estate of Davis v. Delo, 115 F.3d 1388 (8th Cir. 1997) (upholding punitive award of $5,000 against jail superintendent for failure to protect the inmate from correctional officer's use of excessive force in beating inmate about the head and face when the correctional officer had a known propensity to use excessive force on inmates); Thomas v. Booker, 784 F.2d 299 (8th Cir. 1986) (upheld punitive damage award of $5,000 against correctional officer that failed to protect plaintiff by detecting and intervening in a fight between the plaintiff and a fellow inmate); Wade v. Haynes, 663 F.2d 778 (8th Cir. 1981) (upheld punitive damage award of $5,000 for placing an inmate—that was susceptible to physical abuse from members of the general population—in a

41

segregation cell with two inmates from the general population, one of whom had history of fighting, which resulted in the susceptible inmate being beaten and sexual assaulted).

The Court notes that Ballard failed to present any evidence concerning his net worth.  The Eighth Circuit has recognized that the defendant's wealth is but one factor that may be considered in assessing an award of punitive damages, and evidence of a defendant's net worth is not a prerequisite to an award of punitive damages.  Schaub, 638 F.3d 905, 926 (8th Cir. 2011).  "[T]he focus, in determining the propriety of punitive damages, is on the intent of the defendant and whether the defendant's conduct is of the sort that calls for deterrence and punishment over and above that provided by compensatory awards."  Id. at 927 (quoting Coleman v. Rahija, 114 F.3d 778, 787 (8th Cir. 1997)).  Furthermore, it is the defendants burden to introduce evidence of his net worth in order to minimize any punitive damage award.  See Grabinski v. Blue Springs Ford Sales, Inc., 136 F.3d 565, 570-70 (8th Cir. 1998) (holding that failure to present evidence on net worth at trial constitutes a waiver).

Defendants were informed at the conclusion of the July 10, 2012 evidentiary hearing that the Court would entertain the issue of punitive damages in this case if it determined they were warranted.  The Court then advised Defendants they may present any evidence regarding their financial conditions at the supplemental hearing on October 4, 2012.  Defendants failed to present any such evidence.  As Defendants were on notice that punitive damages were in issue here but failed to present evidence regarding the issue, the Court does not believe it is error to award punitive damages without proof of Ballard's financial condition in this case.  See Schaub, 638 F.3d at 926 (holding the district court did not err in awarding punitive damages without considering the defendant's financial means when the defendant chose not to present any evidence on net worth

even though he was on notice that punitive damages were in issue).

IV.     **CONCLUSION**

For the reasons stated, the Court recommends that Williams' claims against Defendants Dolly Simmons, Rachel Jones, Don Thornell, Wayne Walker, Cecil White, Ron Stovall, Woody Giles, and Gary Turner be **DISMISSED** with prejudice; and Defendant Sheila Abraham-Drake be **DISMISSED** without prejudice.  Further, the Court recommends judgement be entered against Defendants Linda Rambo, Janice Nickleson, and Jimmy Ballard in their individual and official capacity.  The Court also recommends $5,000 in compensatory damages be awarded in favor of Williams against Defendants Linda Rambo, Janice Nickleson, and Jimmy Ballard; and that Defendants Linda Rambo, Janice Nickleson, and Jimmy Ballard be required to pay the district court filing fee of $350 (ECF No. 6) that has been assessed against Williams.  Defendants Linda Rambo, Janice Nickleson, and Jimmy Ballard should be held jointly and severally liable for the $5,000 damage award and $350 fee.  Finally, the Court recommends $5,000 in punitive damages be awarded in favor of Williams against Defendant Jimmy Ballard in his individual capacity.

**The parties have fourteen days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

**DATED** this 4th day of March 2013.

/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE